## Chicago Edison Company v. Charles Norman Fay.

1. DEFENSES—*Forged Indorsements.*—Where an incorporated company is induced by means of forged indorsements upon certificates of its stock to take up the same, and issue in lieu thereof, new certificates to another party, the fact that the company acted upon forged indorsements will be no defense to a suit by the owner for a reinstatement of his stock.

2. RATIFICATION—*What Does Not Constitute.*—Where a person forged indorsements upon certificates of stock in an incorporated company, and induced the company to take them up and issue others in lieu thereof, which he negotiated to a third party, the fact the money he received therefor was deposited to the credit of the owner, and that the owner did not return it upon the discovery of the forgery, does not constitute a ratification.

3. PARTIES—*Suits to Compel a Restoration of Stock.*—Where a corporation is induced by means of forged indorsements to take up, and

reissue certificates of its stock in lieu thereof to a third person, in a suit by the owner against the company for a restoration of his stock, the party to whom the reissue was made is not a necessary party.

**Bill to Compel a Restoration of Stock.**—Appeal from the Superior Court of Cook County; the Hon. JOHN BARTON PAYNE, Judge, presiding. Heard in this court at the October term, 1895. Affirmed. Opinion filed January 22, 1896.

## STATEMENT OF THE CASE.

This was a bill filed by appellee, Charles Norman Fay, in the Superior Court of Cook County, against the appellant, the Chicago Edison Company, seeking reinstatement as the holder of 200 shares of appellant's capital stock, of which appellee claimed to have been unjustly and illegally deprived by the action of appellant, and for the issuance to him of new shares evidencing such ownership.

The circumstances out of which the litigation arose are briefly these :

Appellee, in June, 1894, was the owner of 200 shares of the capital stock of the Edison company. On the 23d day of June, 1894, being about to go East for the summer, Fay executed a power of attorney, of which the following is a copy, to one Charles E. Anderson, who then was, and for some time had been, his private secretary :

" Know all men by these presents, that I do hereby make, constitute and appoint Charles E. Anderson to be my true and lawful attorney, for me and in my name, to draw checks, bills of exchange and drafts, and make orders and over-drafts upon the Northern Trust Company of Chicago, and in my name to indorse checks, drafts, bills of exchange, notes and orders for deposit in said Northern Trust Company, hereby confirming all that my said attorney shall do under above authority."

He also intrusted to Anderson the custody of an install-ment certificate upon the surrender of which the stock in question was afterward issued. He left with his brother-in-law, Wilmerding, who was the general superintendent of the Edison company, a power of attorney to surrender the

installment receipt on its full payment and to receive the stock. Anderson drew checks on Fay's bank account for the installments which became due after his departure, and on the 7th of August, 1894, all the installments having been paid, Wilmerding executed a document surrendering the installment receipt, and two certificates, numbered 1334 and 1335, each for 100 shares of stock were, by Wilmerding's direction, delivered by the Edison company to Anderson, Fay's private secretary. Anderson was left in charge of Fay's office at Chicago and of Fay's business during the whole of that summer and until Fay's return in October. He had access to Fay's box of securities at the Northern Trust Company's bank in connection with the cashier, with authority to put up or change securities as collateral to Fay's loans from the bank, and also to realize on all or some of those securities during the summer. Fay had, prior to this time, bought and sold stocks and bonds upon the Chicago Stock Exchange through A. O. Slaughter & Co., bankers and brokers at Chicago, and that firm had become well acquainted with Anderson as Fay's private secretary and man of business. Anderson had also received from Slaughter & Co. various stocks purchased by them for Fay and his confidential relations to Fay were well known to them.

On the 12th of September, 1894, Anderson rang up Slaughter & Co. by telephone, and had a conversation with Mr. Baker of that firm, saying, substantially, that Fay had requested him to sell 100 shares of Edison stock. Baker asked what limit Fay had placed upon it. Anderson replied that the limit was $125 per share. Baker answered that it could not be sold at that figure; whereupon Anderson stated that he would have to communicate with Fay, who was at his summer place in the East, and would, as soon as he could hear from him by wire, let Baker know Fay's reply. The next day Anderson telephoned to Baker that the stock could be sold at that market, and thereupon Slaughter & Co. sold fifty shares of the 100 at the then market price of $123, and gave Anderson a check payable to the order of Fay for $6,137.50, which was the amount of the sale, less their usual

commissions. This check was payable to the order of Fay, and was by Anderson indorsed in Fay's name and deposited in the Northern Trust Company and credited to Fay's account in that bank. On the day of the first conversation with Baker, Anderson sent over to Slaughter & Co.'s office certificate number 1335 for 100 shares, bearing upon its back an assignment purporting to have been made by Fay, but which in fact was a forgery. This certificate was sent to the Edison company's office by Slaughter & Co. and split up into two new certificates, each for fifty shares, one of which was transferred to the party to whom the fifty shares has been sold, and the other made out in the name of Slaughter & Co. On the next day Anderson again telephoned, inquiring whether the remaining fifty shares had been sold. Baker replied that they had not; that the stock was then offered at the price that the first fifty shares had been sold for. Anderson replied that Fay did not want to sell for less than that price, and arranged for a loan of $6,000 on it. For this loan Slaughter & Co. gave a check for $6,000, also payable to Fay's order. This check also was indorsed by Anderson, in Fay's name, and deposited to Fay's credit with the Northern Trust Company.

About September 25th Anderson again called Baker up by telephone and asked if he had yet been able to sell the remaining fifty shares of stock. Baker replied, no; that the price was now $120, and he did not suppose Fay would want to sell at that price. Anderson replied that Fay had use for more money, and that he, Anderson, didn't know exactly what to do about it; that Fay would not want to sell for $120, and he asked if Slaughter & Co. would make Fay another loan; and an arrangement was then made by which Anderson should send over a certificate for another 100 shares, and obtain a loan of $8,000 upon it. Certificate No. 1334, for 100 shares, was sent over, likewise with a forged assignment, and on the same day Slaughter & Co. gave Anderson a check for $8,000, which check was also made payable to Fay's order and was deposited to his credit with the Northern Trust Company. On October 1st the

usual monthly statement of account was mailed by Slaughter & Co., directed to Fay at his office in Chicago. On October 4th another loan of $2,000, upon the 150 shares then in Slaughter & Co's. hands, was arranged by Anderson by telephone; in this case, as before, the check being made payable to Fay's order and being deposited to his credit in the same bank. In arranging for this last loan, Anderson stated to Baker that Fay needed $2,000 more, and that this was all he would need. On October 8th Anderson telephoned Baker to sell twenty-five shares of stock at $120. Slaughter & Co. found a purchaser at that price and sold him twenty-five shares, crediting Fay's account with the proceeds, and mailing Fay, at his office in Chicago, a statement of the sale. The latter statement was received by Fay. The one of October 1st he testified that he had never seen.

These comprise all the transactions between Anderson and Slaughter & Co. The second certificate was also split up, twenty-five shares being transferred to the purchaser and the remainder being held by Slaughter & Co., making 125 shares still held by them as security for their loans. Neither Slaughter nor Baker, his partner, knew of the power of attorney executed by Fay to Anderson.

Fay returned to Chicago about October 7th. On receiving the statement of the sale of the twenty-five shares he called at Slaughter & Co.'s office for explanation. Baker testified that he then furnished Fay with a full statement of all the transactions with Anderson. While Fay denies that a full statement of account was then furnished him, he admits that Baker did make a verbal statement of his transactions with Anderson, and he says that such statement led to an investigation by him and to the discovery that Anderson had forged his name upon each of the two certificates. He at once went to the Northern Trust Company, had his account written up, and revoked Anderson's power of attorney. The written revocation is dated " October 10, at about 4:30 P. M."

He says: " I think I examined my bank account and re-

voked the power of attorney the same day that I discovered the forgery."

On the 10th or 11th of October Fay ascertained all the facts concerning Anderson's dealings with Slaughter & Co. and his misuse of his, Fay's, bank account. Upon the statement of his accouut, which was furnished to Fay by the Northern Trust Company, and is in evidence, Fay checked in red ink such of Anderson's deposits and checks as had been legitimately made for him by Anderson. As to the deposits and checks not so marked in red ink, Fay testified that he knew nothing whatever.

The bank's statement shows that during August Anderson had checked out of Fay's bank account, for purposes concerning which Fay is ignorant, $2,950, and had deposited $1,000 obtained from some source as to which Fay is ignorant. Fay's balance in the bank on the first day of September was $184.10. If the deposits and checks concerning which nothing is known had not gone through Fay's account his bank balance would have been $2,134.10. In other words, Anderson had used for unknown or illegitimate purposes $1,950 more than he had deposited. That is to say, Anderson's net stealings from Fay in August had amounted to $1,950.

Between the 1st of September and the 13th of that month (the date when Slaughter & Co. gave Anderson their first check), the illegitimate transactions had increased so that Fay's bank account then showed a balance of only $116.28 and Anderson's net defalcations amounted to $2,775. On September 8th, 10th and 11th the bank account was actually overdrawn, but on the 12th a deposit brought it up to the amount we have stated, $116.28.

The Edison company answered the bill, setting up substantially the facts before stated, and claiming that by virtue thereof Fay had ratified the transactions, made on his behalf with Slaughter & Co., by Anderson, and was estopped from repudiating them, and that the Edison company's refusal to restore Fay to the ownership of his shares, was by reason thereof, and that its issuance of the new

shares was therefore rightful and valid. It also filed a cross-bill setting up the same facts, and making Slaughter & Co., as well as Fay, parties defendant, alleging that an accounting should be had between Fay and Slaughter & Co., and their relative and respective rights, interests and equities in said stock be ascertained and determined, and the amount received by Fay from Slaughter & Co. be ascertained before Fay could assert any right or interest in said stock as against the Edison company or Slaughter & Co., and that such amount ought to be paid by Fay to Slaughter & Co. before Fay could call upon the Edison company or Slaughter & Co. for the surrender of the stock, or any portion thereof, and that the Edison company must be protected and indemnified by Slaughter & Co. in the event that it should be obliged to issue new certificates to Fay.

The prayer of the cross-bill was that Slaughter and Baker, together with Fay, be made defendants, and sets forth the date and amount of each sale of such stock made by Slaughter & Co., together with the date and amount of each loan made by them upon the certificates, and that the rights and equities of Slaughter & Co. and Fay, growing out of the transactions, might be settled and adjudicated, and it might be found and ascertained which of said parties was legally entitled to said stock, and what, if any, sum or sums were due and owing to Slaughter & Co. on account of such transactions, and whether or not Fay, on the payment thereof, would be entitled to the surrender and transfer of the stock back to him, and that until such settlement and adjustment, Fay might be enjoined from prosecuting his bill and from making any claim for the re-issuance of the stock as against the Edison company, and that the Edison company might either be protected as against the claims of Fay, or might be indemnified by Slaughter & Co., and for general relief.

Slaughter & Co. answered the cross-bill, setting up their rights and interests, based upon the facts which we have already stated. They also filed a cross-bill against Fay,

asking that their rights and equities, as against Fay, growing out of these transactions, might be settled and adjusted, and that it might be found whether they or Fay are legally entitled to hold the stock, and what sums were due and owing from Fay to them, on account of the transactions in question, and whether or not Fay was entitled to a surrender of the stock, and if he should be found to be entitled to the same on the payment of the sums so found to be due, that then he might be ordered and decreed to pay the same within a time to be fixed by the court, and in default thereof, that all his interest in the stock might be forfeited, and that Slaughter & Co. might have liberty to sell the same, free and clear of all claims of Fay, and that until such adjustment Fay might be enjoined from making any claim for the re-issuing of the stock, either against the Edison company or Slaughter & Co., and for general relief.

Fay's counsel moved to strike Slaughter & Co.'s cross-bill from the files, and also demurred to the cross-bill of the Edison company. The court sustained him on both points and dismissed both cross-bills.

On the hearing, a decree was entered in accordance with the prayer of the original bill filed by Fay. From that decree the Edison company has appealed, and assigns for error that the court erred in granting Fay the relief sought, and also in dismissing the two cross-bills.

ULLMANN & HACKER, attorneys for appellant.

WILLIAMS, HOLT & WHEELER, attorneys for appellee.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

Appellant was, by means of forged indorsements upon certificates of stock owned by appellee, induced to take the same up and issue therefor stock to A. O. Slaughter & Co.

It is no defense for appellant that it acted upon forged indorsements placed upon the certificates of stock owned by appellee. Cook on Stockholders, Sec. 365.

What appellant urges is that appellee has ratified the disposal of his certificates of stock. We do not regard his action as having that effect.

In saying this, we keep in mind that the unauthorized act, a ratification of which is claimed, is the forgery of appellee's name upon certain stock certificates and the disposal of them to A. O. Slaughter & Co.

The fact that the money thus obtained was by the forger deposited to the credit of appellee, and that he has not returned the same either to A. O. Slaughter & Co. or to appellant, does not constitute a ratification. Appellee can not have his stock and keep this money; he is entitled to his stock, and when he gets it will be bound to restore to whomever may be entitled to the same, the money he holds as the fruit of the fraudulent sale of his stock.

Nor is appellee, before he can have his stock restored to him, bound to wait until the equities existing between appellant and A. O. Slaughter & Co., or appellee and the same firm, are ascertained. Nor is the firm of Slaughter & Co. a necessary or proper party to his bill against appellant for a restoration of his stock. Pratt v. Boston & Albany Ry. Co. 126 Mass. 443.

As against appellee, appellant has no equity; it paid nothing; gave nothing to him for his stock.

If appellee were alleged to be pecuniarily irresponsible, so that there was danger that appellant or A. O. Slaughter & Co. might not be able to collect from him, appellee, any claim growing out of this matter, a different case would be presented.

We do not intend in anything said to express an opinion as to the nature or extent of the obligations, if any, of appellee to either appellant or A. O. Slaughter & Co. on account of any transactions of Anderson.

It is not set up that the restoration of appellee to his rights as a stockholder will cause an over-issue of stock by appellant. No question of over-issue arises in this case, even if, under the circumstances, such a question could in this litigation be made.

The decree of the Superior Court is affirmed.